# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-02160

WANDA JAMES,

Plaintiff,

v.

CALLIE RENNISON, in her individual and official capacities;
KEN MONTERA, in his individual and official capacities;
ELLIOTT HOOD, in his individual and official capacities;
FRANK MCNULTY, in his individual and official capacities;
RAY SCOTT, in his individual and official capacities;
ILANA SPIEGEL, in her individual and official capacities; and
MARK VANDRIEL, in his individual and official capacities,

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Wanda James, by and through her counsel, Andy McNulty, Mari Newman, and Madeline Leibin of NEWMAN|MCNULTY, alleges for her Complaint and Jury Demand as follows:

### INTRODUCTION

1.      Wanda James made history when Colorado voters elected her to the University of Colorado Board of Regents in November 2022: she became only the second Black woman to serve on the Board and the first in over forty-three years. Regent James ran on a promise to fight fiercely for students, faculty, and the communities the University has historically failed. She has kept that promise.

2.      In January and February 2025, Regent James spoke out against a University-funded campaign called *Tea on THC*. The campaign, developed by the Colorado School of Public Health

1

in partnership with a consulting firm called Initium Health, peddled racist tropes about Black cannabis users. Regent James called it what it was. She criticized the campaign publicly. She spoke up for those the University is supposed to serve.

3.    The Defendants, as members of the University of Colorado Board of Regents, punished her for it.

4.    On July 2, 2025, the Board of Regents censured Regent James. Regent Nolbert Chavez, the only other person of color on the Board, was the lone dissenting vote. Further, the Board[1] stripped Regent James of committee assignments and leadership positions through which regents exercise the bulk of their decisional authority. It barred her from internal and external events where regents represent the University, meet stakeholders, and perform the public duties of their elected office. The sanctions materially prevent Regent James from performing the duties of her office.

5.    The sanctions have no end date and will last the remainder of her term as Regent (a full three years); they remain in place unless and until a majority of the Board votes to lift them. Again, Regent James has made history: this time, for being subjected to—and suffering the impacts of—sanctions longer than any other regent in University of Colorado history.

6.    Regent James' sanctions are the product of racist and sexist animus. The Defendants investigated, censured, and sanctioned her because she is a Black woman who dared to speak out against a University-funded campaign that peddled false and racist stereotypes about Black people.

---

[1] Defendants, as the controlling members of the University of Colorado Board of Regents whose conduct is at issue in this Complaint, are referred to collectively herein as "the Board" or "the Board of Regents".

7.      Regent James' speech is the most quintessential form of First Amendment protected expression: as an elected official, she spoke out against government-sponsored racism in the form of a factually untrue public health campaign that disparaged and targeted the Black community. She used her position as an elected regent to represent her constituents. The First Amendment protects that speech absolutely.

8.      Regent James brings this action to vindicate her rights under the First and Fourteenth Amendments to the United States Constitution and to restore her to the full exercise of the office the voters of Colorado elected her to hold.

## PARTIES

9.      Plaintiff Wanda James is a citizen of the United States and a resident of and domiciled in the State of Colorado. She is a duly elected member of the University of Colorado Board of Regents, representing Colorado's 1st Congressional District. She was elected in November 2022 and is serving a six-year term. She is the second Black woman ever elected to the University of Colorado Board of Regents and only the third Black person ever to serve as a University of Colorado regent. She is currently the only Black member of the University of Colorado Regents.

10.     Defendant Callie Rennison is a citizen of the United States and a resident of and domiciled in the State of Colorado. Regent Rennison was, at all times relevant to the allegations in this Complaint, the Chair of the Board of Regents, and was acting within the scope of her official duties and under color of state law. Regent Rennison represents Colorado's 2nd Congressional District. Regent Rennison voted to censure and sanction Regent James. Regent Rennison is sued in her individual and official capacities.

11.     Defendant Ken Montera is a citizen of the United States and a resident of and domiciled in the State of Colorado. Regent Montera was, at all times relevant to the allegations in this Complaint, the Vice Chair of the Board of Regents, and was acting within the scope of his official duties and under color of state law. Regent Montera represents Colorado's 5th Congressional District. Regent Montera voted to censure and sanction Regent James. Regent Montera is sued in his individual and official capacities.

12.     Defendant Elliott Hood is a citizen of the United States and a resident of and domiciled in the State of Colorado. Regent Hood was, at all times relevant to the allegations in this Complaint, a member of the Board of Regents representing Colorado at large, and was acting within the scope of his official duties and under color of state law. Regent Hood voted to censure and sanction Regent James. Regent Hood is sued in his individual and official capacities.

13.     Defendant Frank McNulty is a citizen of the United States and a resident of and domiciled in the State of Colorado. Regent McNulty was, at all times relevant to the allegations in this Complaint, a member of the Board of Regents representing Colorado's 4th Congressional District, and was acting within the scope of his official duties and under color of state law. Regent McNulty voted to censure and sanction Regent James. Regent McNulty is sued in his individual and official capacities.

14.     Defendant Ray Scott is a citizen of the United States and a resident of and domiciled in the State of Colorado. Regent Scott was, at all times relevant to the allegations in this Complaint, a member of the Board of Regents representing Colorado's 3rd Congressional District, and was acting within the scope of his official duties and under color of state law. Regent Scott voted to censure and sanction Regent James. Regent Scott is sued in his individual and official capacities.

4

15. Defendant Ilana Spiegel is a citizen of the United States and a resident of and domiciled in the State of Colorado. Regent Spiegel was, at all times relevant to the allegations in this Complaint, a member of the Board of Regents representing Colorado's 6th Congressional District, and was acting within the scope of her official duties and under color of state law. Regent Spiegel voted to censure and sanction Regent James. Regent Spiegel is sued in her individual and official capacities.

16. Defendant Mark VanDriel is a citizen of the United States and a resident of and domiciled in the State of Colorado. Regent VanDriel was, at all times relevant to the allegations in this Complaint, a member of the Board of Regents representing Colorado's 8th Congressional District, and was acting within the scope of his official duties and under color of state law. Regent VanDriel voted to censure and sanction Regent James. Regent VanDriel is sued in his individual and official capacities.

## JURISDICTION AND VENUE

17. This action arises under the Constitution and laws of the United States. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

18. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

19. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

## FACTUAL ALLEGATIONS

**Regent James made history as the first Black woman elected to the University of Colorado Board of Regents in over forty-three years.**

5

20.　　Regent James is a trailblazer. She has broken ground in Colorado — and across the country — as a Black female entrepreneur, business owner, political leader, and equity advocate. She is a United States Navy veteran who was commissioned by, and graduated from, the University of Colorado. She was the first Black woman commissioned through Naval ROTC Battalion at CU Boulder. Regent James is a longtime voice for racial justice in Colorado and across the country.

21.　　Among her many accomplishments, Regent James is one of the country's most prominent Black cannabis business owners and was the first Black owner of a dispensary in the United States. She has been a leading advocate for equity, social justice, and racial repair in the cannabis industry. She has testified before Congress, served on state and national boards, and advised policymakers on how to undo the racial harms of the failed War on Drugs.

22.　　In November 2022, the voters of Colorado's 1st Congressional District elected Regent James to the University of Colorado Board of Regents. She was sworn in in January 2023. Her six-year term runs through January 2029.

23.　　Regent James is the second Black woman ever elected to the Board and is currently the only Black regent on the Board.

24.　　Regent James ran on a promise to fight fiercely for students, faculty, and the communities the University has historically failed. She promised to use her elected office to speak truth to power, to challenge University policies that harm marginalized communities, and to demand accountability from the University and its leaders.

25.　　Regent James kept that promise. From the moment she took office, she has used her position to advocate for the people of Colorado, and in particular for the communities of color that have too long been failed by the University of Colorado.

**The University of Colorado has a long, well-documented history of anti-Blackness.**

6

26.    The University of Colorado was founded in 1876. In the 150 years since its founding, the University has appointed only two Black chancellors: Mary Frances Berry in 1976 and Roy Wilson (who was appointed chancellor of CU-Denver and the Health Sciences Center) in 2006.

27.    The current composition of the University's leadership reflects a similar pattern. None of the University's Chancellors are Black. There is only one Black person on the President's leadership team, and that person is a consultant.

28.    The University's faculty demographics further reflect deep institutional racism. As of 2020, the CU Boulder campus employed more than forty-five white faculty members for every one Black faculty member. As of 2023, the CU Denver-Anschutz campus employed more than one hundred and ten white tenured faculty members for every one Black tenured faculty member. Among professors working toward tenure at CU Denver-Anschutz, the disparity was forty-three white faculty for every one Black faculty member.

29.    The University's failure to hire and retain Black faculty has tangible consequences for Black students. Black students arrive at the University without Black faculty role models to guide them through the academic and social challenges of a predominantly white institution.

30.    In 2016, the CU Boulder Department of Civil, Environmental, and Architectural Engineering denied tenure to Dr. Lupita Montoya, a Latina assistant professor whose research addressed air quality on the Navajo Nation, working conditions in Colorado nail salons, and educational access for first-generation Black, Indigenous, and People of Color ("BIPOC") students. The University devalued her community-engaged scholarship as "service" rather than "research," even as her colleagues recommended she be granted tenure and outside experts in her field endorsed her work. Dr. Montoya filed a charge of discrimination with the Equal Employment

Opportunity Commission alleging that the University had discriminated against her on the basis of race and sex.

31.    In September 2023, graduate students and faculty at the CU Boulder School of Education published a Shadow Report documenting the systematic pushout of women of color faculty from the School. The Shadow Report described the conditions that drove all four tenure-track women of color faculty in the School of Education out of their positions by the summer of 2023. It described surveillance, bullying, harassment, minimizing of professional achievements, and public attacks on personhood and scholarship. The Shadow Report described the University of Colorado Boulder as having a persistent history of rampant and unbridled anti-Blackness. It documented that the systematic bullying, denigration, and surveillance of women of color faculty — and Black women faculty in particular — was excessive, obvious, and undeniable.

32.    Members of the University's own faculty have publicly described the University's School of Public Affairs as a place where women of color scholars have been consistently marginalized. By the end of the 2023–2024 academic year, seven of the ten faculty members of color in the School's Criminal Justice program had left.

33.    When Regent James took office, this was the institution she had been elected to oversee.

34.    Regent James was elected to address that institutional failure. She did not shy away from naming what the University had refused to name. She told the public, plainly, that CU has an anti-Blackness problem. She used her elected office to do precisely what her constituents elected her to do.

35.    Defendants did not respond to Regent James' advocacy by reckoning with the University's history of anti-Blackness. They responded by silencing her.

8

**The *Tea on THC* campaign peddled historically racist tropes about the Black community.**

36.    In late 2024 and early 2025, the Colorado School of Public Health ("CSPH") developed a public health campaign called *Tea on THC.* The campaign was developed and run in partnership with a Denver-based consulting firm called Initium Health.

37.    The CSPH is a program of the University of Colorado Anschutz Medical Campus.

38.    The *Tea on THC* campaign was funded by Colorado state marijuana tax fund dollars appropriated to the University of Colorado.

39.    The *Tea on THC* campaign trafficked in harmful, historically racist stereotypes about the Black community. It pathologized cannabis use in ways that disproportionately stigmatized Black communities. It echoed decades of racist propaganda about Black people and marijuana that have long fueled the disproportionate criminalization and incarceration of Black Americans:



*Above is the harmful and racist image Ms. James spoke out against.*

**Regent James exercised her First Amendment rights to speak out against the racist campaign and its use of public funds.**

40.     Beginning in late January 2025, Regent James used her position as an elected regent, and her voice as a private citizen and a Black community leader, to publicly and privately criticize the *Tea on THC* campaign.

41.     Regent James communicated her concerns about the *Tea on THC* campaign to the President's Office at the University of Colorado and members of the public.

42.     Regent James' speech was on a matter of public concern. She criticized the use of public funds to run a public health campaign that traded in racist stereotypes.

43.    Regent James made clear in her communications that she was exercising her First Amendment rights and fulfilling her duty as an elected regent. Regent James' speech was protected by the First Amendment to the United States Constitution. Indeed, it is difficult to imagine speech closer to the core of the First Amendment: an elected official using her voice to criticize a taxpayer-funded government program that trafficked in racist stereotypes, and advocating for a reallocation of public resources.

Initium Health publicly acknowledged and apologized for the conduct opposed and highlighted by Regent James.

44.    After Regent James criticized the campaign, Initium Health itself publicly acknowledged the harm. In a written statement, Initium acknowledged that the images "evoked historical misrepresentations," stated that it "regret[s] the pain it has caused," and committed to "collaborate more closely with the Colorado School of Public Health to establish a more thorough review process for all campaign materials."

45.    The CSPH likewise issued a public statement on January 28, 2025, in which it "deeply regret[ted] any distress" caused by the imagery and acknowledged its "responsibility to ensure our efforts reflect cultural awareness and sensitivity in every aspect of the School's work."

**Regent James spoke out regarding the University of Colorado's failure to hire Black professionals.**

46.    On February 3, 2025, Regent James was invited — as the only Black regent — to speak at the University of Colorado's Black History Celebration.

47.    Consistent with her promise to promote equity and speak truth to power, Regent James was forceful in pointing out the lack of Black leadership within the CU system.

48.    Regent James opened by observing that every time she examines who leads the University, "there's no us" (referring to Black folks like herself). Regent James invited the

11

audience to verify her claims in real time, urging attendees to take out their phones and look up the University of Colorado's leadership online.

49.    Regent James then catalogued, campus by campus, the absence of Black leadership across the University of Colorado system.

50.    Regent James recounted that, when she became a Regent three years earlier, she was told that Black people simply did not apply for University leadership positions. Skeptical of that explanation, she began soliciting resumes directly from Black applicants and tracking who applied. Regent James publicly reported the results of her inquiry: contrary to what she had been told, Black candidates were in fact applying for University leadership positions. Further, when she was then told the positions were highly competitive and that not everybody is qualified, her continued investigation revealed that some of the people who applied, who happened to be Black, on merit, were head and shoulders above those who were hired.

51.    Regent James noted that the lack of diversity in the CU System is of statewide public concern as the University of Colorado is the third-largest employer in the State of Colorado.

52.    Regent James concluded by declaring that it is time for the University of Colorado to start hiring Black folks into leadership positions and pledged that as long as she was a Regent that she was going to keep the pressure on her fellow Regents, and the CU system, to hire qualified Black applicants into leadership positions.

**Defendants retaliated against Regent James.**

53.    Regent Policy 2.M is the Board of Regents' internal censure procedure. It permits the Board to censure a regent who has breached a regent duty defined by "a specific statute, Board Law, or Board policy."

12

54.     Less than three months following Regent James' speech at the Black History Celebration on the University of Colorado's Boulder campus where she pointed out the lack of Black professionals hired at every university in the University of Colorado system, the University set her censure in motion.

55.     In March 2025, the Board retained two law firms, Garnett Powell Maximon Barlow & Farbes and First & Fourteenth, as so-called "independent investigation counsel" to evaluate allegations against Regent James.

56.     On April 1, 2025, the so-called "independent investigation counsel" sent Regent James written notice of the allegations they were evaluating. The allegations focused entirely on Regent James' speech: specifically, that she had expressed opinions critical of the *Tea on THC* campaign publicly and privately.

57.     Each of the allegations was, on its face, an allegation that Regent James had engaged in protected First Amendment speech.

58.     On June 13, 2025, the Board publicly voted to invoke Regent Policy 2.M and proceed against Regent James. That same day, Garnett Powell Maximon Barlow & Farbes and First & Fourteenth sent Regent James a written notice of the specific regent duties she was alleged to have breached: Regent Policy 2.A (Conflicts of Interest); Regent Policy 2.J (Fiduciary Obligations); Regent Policy 2.I (Political and Social Expression by Regents); Regent Policy 5.B.1(B) (Academic Freedom); and Colo. Rev. Stat. Section 24-18-108.5 (Rules of Conduct for Members of Boards).

59.     On June 18, 2025, Regent James, with her counsel present, participated in an interview with members of Garnett Powell Maximon Barlow & Farbes and First & Fourteenth.

60.     On June 23, 2025, Regent James, through counsel, submitted a detailed eighteen-page written response to the allegations. In her response, Regent James demonstrated that every one of the allegations against her rested on constitutionally protected speech; that the allegations misrepresented the timeline, content, and impact of her communications; and that the investigation itself violated her rights under the First and Fourteenth Amendments to the United States Constitution.

61.     On June 30, 2025, Garnett Powell Maximon Barlow & Farbes and First & Fourteenth submitted a memorandum to the Board summarizing their investigation.

**The Board's investigators refused to consider evidence of racism at the University of Colorado and toward Regent James.**

62.     In their June 30, 2025, memorandum to the Board, Garnett Powell Maximon Barlow & Farbes and First & Fourteenth admitted that they did not consider any allegations of racism within the University system as part of their investigation.

63.     That admission exposes the pretext in the investigation. The Board was preparing to censure a Black woman regent because she had spoken out against a University-funded campaign that she contended was racist, and the Board's hand-picked investigators announced at the outset that they would not even look at the question of racism.

64.     An investigation that refused to consider the core factual premise of Regent James' speech, namely that the University had funded a racist campaign, as well as whether the investigation could have been motivated by racial bias on the part of the Board, was not a fair investigation. It was a charade designed to produce a foregone conclusion.

65.     Notably, the investigation nevertheless gathered evidence about the political impact of Regent James' speech. Garnett Powell Maximon Barlow & Farbes and First & Fourteenth interviewed fifteen witnesses, collected emails, text messages, and social media posts, and even

14

made multiple requests to the Governor's Office for interviews. They were interested in every aspect of Regent James' speech except the one that would have vindicated it: the racism at the University that provoked it.

66.    The racially charged and biased treatment of Regent James was apparent in their questioning. Stunningly, during her interview Regent James was asked whether she smokes a joint every day. No similar invasion of personal life was visited upon the non-Black regents that the same outside counsel simultaneously investigated.

67.    Upon information and belief, the University of Colorado spent approximately a half-million dollars of public funds on retaining the two law firms to investigate Regent James and Chair Rennison.

**The University's own senior leaders defended the racist campaign to Regent James by deploying racist tropes.**

68.    On January 26, 2025, Regent James called Don Elliman, the Chancellor of the University of Colorado Anschutz Medical Campus, at the request of CU President Todd Saliman, to raise her concerns about the racist imagery in the *Tea on THC* campaign.

69.    Chancellor Elliman responded by telling her: "well, the images aren't great but you know, it was a Black man that made them."

70.    Chancellor Elliman's remark was itself racist. It deployed the familiar apologia that racist content cannot be racist if the content's creator is Black. That apologia is a racist trope. It trivializes racism, treats Black people as a monolith, and uses a Black person's identity as a shield for the University's own misconduct.

71.    The University's investigators faithfully recorded Chancellor Elliman's racist remark in their memorandum to the Board. Notably, the investigators, who had been instructed not

to "consider any allegations of racism within the University System," treated Chancellor Elliman's remark as irrelevant to their inquiry.

72.    Defendants disciplined the Black regent who called out the racism. It did nothing to the non-Black Chancellor who defended it with a racist trope.

**The Board ignored the warnings of Former Denver Mayor Webb and other prominent Black Coloradans that the actions against Regent James were racist.**

73.    On March 20, 2025, former Denver Mayor Wellington Webb sent a letter to the Board of Regents. Mayor Webb wrote to the Board before the University retained its "independent investigation counsel" against Regent James, and before the Board ever held a vote on her censure.

74.    Mayor Webb is one of the most prominent Black political figures in Colorado history. He served as the Mayor of Denver from 1991 to 2003. His warning to the Board carried the weight of decades of leadership on issues of racial justice in the State.

75.    Mayor Webb's letter documented the University of Colorado's long history of failing Black faculty, Black students, and Black communities. He noted that since the University was founded in 1876, only two Black chancellors have ever been appointed, which he described as a disgrace of 149 years.

76.    Mayor Webb specifically praised Regent James. He told the Board that Regent James was the only regent who had identified the offensive racial imagery in the *Tea on THC* campaign, and that she had done so at significant personal cost.

77.    The Board ignored Mayor Webb. The University proceeded with the investigation that would culminate in Regent James' censure.

78.    Mayor Webb's warning was not isolated. Members of Colorado's Black community spoke out at every stage of the proceedings against Regent James, including the President of the Colorado Senate, the Black Legislative Caucus, and the former Speaker of the

16

Colorado House. They told the Board, in writing and in public testimony, that the campaign against Regent James was racially motivated and would do lasting damage to the University's relationship with the communities it claims to serve.

**The Board censured Regent James; stripped her of committee assignments and leadership positions; and banned her from attending events in her official capacity.**

79.    On July 2, 2025, the Board of Regents convened a special meeting to consider censure and sanctions against Regent James.

80.    At that meeting, by a vote of seven-to-one, with Regent Nolbert Chavez dissenting and Regent James abstaining, the Board voted to censure Regent James under Regent Policy 2.M.

81.    The Board found that Regent James had violated Regent Policy 2.J.1 (Duty of Care) and Regent Policy 2.J.2 (Duty of Loyalty). The Board did not find that Regent James had engaged in any conflict of interest under Regent Policy 2.A; she was cleared of that charge.

82.    Importantly, the censure resolution itself acknowledges Regent James' "individual right . . . to express opinions on matters of social and political concern," as recognized by Regent Policy 2.I. But, the Board then punished her for doing exactly that.

83.    Along with the censure, the Board adopted a separate sanctions resolution. That resolution imposed the following sanctions on Regent James:

(a) Regent James was removed from all regent committee assignments, including regent committee leadership positions, and was precluded from any such future assignments for the entirety of her term, almost three full years; and

(b) The Board rescinded all invitations previously extended to Regent James to internal or external University events that regents attend in their official representational capacity, and precluded any such future invitations.

17

84.    The Board imposed these sanctions without any end date. The resolution provides only that "some or all of the sanctions described above may be revised or removed before the end of Regent James' term of office by a majority of the Board of Regents, upon recommendation by the chair and vice-chair."

85.    Under the resolution, the sanctions will remain in effect for the remainder of Regent James' term, until January 2029, unless a majority of the Board, acting on the recommendation of the chair and vice-chair, chooses to lift them.

86.    The sanctions are not symbolic. Regent committees are the primary mechanism through which individual regents exercise the decisional authority of their office. Through committee assignments, regents review and shape University budgets, academic affairs, governance policies, and executive decisions.

87.    Likewise, the events from which Regent James was disinvited in her official capacity are the events at which regents represent the University of Colorado to students, faculty, donors, community leaders, and the public. They are the face-to-face venues at which regents discharge the representational duties of their elected office.

88.    Regent James has been banned from attending, in her official capacity, government relations events, such as policy week in Washington D.C. where the University delegation meets with members of Congress and federal leadership to discuss higher education policy and federal funding. She has been banned from attending fundraising galas and signature events where she would normally help raise money for the University. Regent James has been barred from attending economic development summits and public policy forums.

89.    The sanctions strip Regent James of the authority that her constituents elected her to hold and duties they expect her to perform. The censure and sanctions prevent Regent James from doing the job she was elected to do.

**The Board's articulated reason for its censure is demonstrable pretext.**

90.    As a pretextual justification for censuring Regent James, the Board claims that Regent James was somehow responsible for budget cuts that had occurred before she engaged in protected speech.

91.    On November 1, 2024, the Governor's Office, through its Office of State Planning and Budgeting ("OSPB"), requested in Governor Polis's November budget that funding to the Colorado School of Public Health under HB 21-1317 be cut by 50%, or approximately $1 million, for fiscal year 2025-2026.

92.    On January 31, 2025, OSPB formally communicated to the legislature that the Governor's Office was seeking full elimination of the CSPH's cannabis-related funding, a cut of $2 million annually.

93.    These decisions had nothing to do with Regent James or her speech.

94.    On July 2, 2025, the Governor's Office transmitted to the Board's independent investigation counsel a written statement confirming that Governor Polis made the funding decisions regarding the Colorado School of Public Health's cannabis program independently and based on the Governor's own budget priorities.

95.    The statement confirmed that the Governor did not have any recollection of speaking to Regent Wanda James during the time the administration was developing the 2025-2026 budget submission.

96.     In other words, the Governor's Office, through OSPB, had decided to cut funding to the CSPH's cannabis program before Regent James ever spoke a public word against the *Tea on THC* campaign, and without any input from her. Funding cuts Regent James was later accused of "causing" had already been decided by the Governor, acting on his own budget priorities.

Colorado's Black political leaders denounced the Board's censure of Regent James.

97.     Following the Board's vote to censure and sanction Regent James, leaders of Colorado's Black community publicly condemned the Board's censure of Regent James as racially motivated.

98.     The Black Colorado Democrats issued a public statement describing the Board's action as morally indefensible, politically motivated, and disturbingly reminiscent of an era when the University of Colorado had yet to fully embrace integration and equity. The group declared: "What we witnessed was not just a censure but a modern-day procedural lynching."

99.     Defendants nonetheless refused to lift the sanctions and have refused to lift them to this day.

**The Colorado Attorney General publicly denounced the censure as a First Amendment violation.**

100.    Following the Board's vote to censure and sanction Regent James, the Colorado Attorney General, Phil Weiser, publicly condemned the Board's action.

101.    Attorney General Weiser stated, about the sanctions imposed on Regent James: "The First Amendment protects the right to free expression. Neither a White House executive order nor a public university policy can override this fundamental right."

102.    Attorney General Weiser's statement confirms what was obvious from the face of the Board's own censure resolution: the Board punished Regent James for engaging in constitutionally protected speech.

**The Board applied Policy 2.M against Regent James in a disproportionately harsh manner as compared to the non-Black and male regent censured under the same policy.**

103.    In the history of Regent Policy 2.M, only one other regent has ever been censured: Regent Glen Gallegos, who was censured on October 12, 2022.

104.    Regent Gallegos is not Black, and is a man.

105.    Regent Gallegos's censure arose out of conduct that did not involve speech on matters of public concern, and in particular did not involve speech about race or racism at the University of Colorado. Instead, Regent Gallegos's censure arose out of conduct that the Board itself described as "disparaging, disrespectful and, at times, has been perceived as threatening." The Board found that Regent Gallegos had violated four separate regent policies governing personal conduct.

106.    The Board censured Regent Gallegos by a unanimous nine-to-zero vote. Regent Gallegos voted in favor of his own censure.

107.    By contrast, the Board censured Regent James by a vote of seven-to-one, with Regent James abstaining. The only regent who voted against Regent James' censure was Regent Nolbert Chavez, who is the only other person of color currently serving on the Board besides Regent James.

108.    The Gallegos censure resolution provided Regent Gallegos with a defined path to have his sanctions lifted and he did, in fact, have his sanctions lifted after a few months.

109.    The James sanctions resolution contains no comparable path. The resolution states only that the sanctions may be revised or removed by a majority vote upon recommendation by the chair and vice-chair. It identifies no conduct that, if undertaken by Regent James, would entitle

21

her to such relief. It identifies no criteria the Board would apply. It leaves Regent James, instead, in indefinite suspension at the unfettered discretion of the regents who silenced her.

110.    As a result, Regent James has been subjected to sanctions for longer than any other regent in the history of the University of Colorado.

111.    The Board has treated a Black and female regent more harshly than a non-Black and male regent for engaging in speech that is protected by the First Amendment.

**The Board treated Chair Rennison, a non-Black regent facing contemporaneous misconduct allegations, dramatically more favorably than it treated Regent James.**

112.    At the same time that the Board was investigating Regent James for her speech, the Board was investigating its own Chair, Defendant Callie Rennison, a non-Black regent, for allegations of misconduct that, unlike Regent James' protected speech, actually implicated the kind of fiduciary duties Regent James was accused of breaching.

113.    Upon information and belief, the allegations against Chair Rennison included, among other things, that she received full-time compensation for part-time work, that she improperly steered University jobs and consulting opportunities to personal friends, and that she engaged in humiliating, hostile, and retaliatory conduct toward other regents and University staff in meetings.

114.    Upon information and belief, it was Chair Rennison who suggested that the Board investigate Regent James in the first place.

115.    The Board retained the same two outside law firms, Garnett Powell Maximon Barlow & Farbes and First & Fourteenth, to investigate Chair Rennison that it retained to investigate Regent James. Garnett Powell Maximon Barlow & Farbes and First & Fourteenth did not conduct a thorough investigation; they failed to interview key witnesses, including the

22

University of Colorado-Denver faculty and staff who brought the charges against Regent Rennison.

116. On June 13, 2025, the same day the Board publicly voted to move forward with censure proceedings against Regent James, the Board unanimously exonerated Chair Rennison of every allegation of fiduciary misconduct.

117. Tellingly, the Board unanimously cleared a white regent facing allegations of actual fiduciary misconduct on the very same day the Board voted to proceed against a Black regent for nothing more than her protected speech.

**Defendants caused Regent James to suffer significant harm.**

118. In addition to the ways the censure and sanctions imposed on Regent James have deprived her of authority she enjoys by virtue of her election, Defendants have also caused Regent James distinct and significant harm.

119. They have prevented her from serving her constituents as she was elected to serve them.

120. They have denied her the duties of her office, including the right to sit on regent committees, to chair or serve in leadership positions on those committees, and to represent the University at official events.

121. The committee assignments stripped from Regent James included those committees on which she had served as the only Black regent. The Defendants thereby silenced the only Black voice on the committees that govern the University's response to issues of racial equity.

122. Defendants have publicly branded Regent James, the only Black woman ever to serve on the Board of Regents, as a person whose speech is so unacceptable that she alone must be silenced and sidelined.

23

123.    They have caused Regent James significant emotional distress, humiliation, harm to her professional reputation, and loss of the dignity of her elected office.

124.    Because of the sanctions, Regent James has been chilled from speaking out on issues of racism at the University of Colorado.

125.    The sanctions would chill a person of ordinary firmness from engaging in speech critical of the University of Colorado.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment Violation
### Free Speech and Petitioning

126.    Plaintiff incorporates all other paragraphs of this Complaint as if set forth herein.

127.    At all times relevant to this Complaint, Defendants acted under color of state law.

128.    Plaintiff was engaged in protected speech, petitioning, and association.

129.    Plaintiff's speech was on a matter of public concern and did not violate any law.

130.    Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech and association rights.

131.    Defendants' conduct was a content-based and/or viewpoint-based restriction on Plaintiff's speech and petitioning.

132.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which reasonable persons in Defendants' position knew or should have known.

133.    Defendants' actions were not narrowly tailored to an important or compelling government interest.

134.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

24

135.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer injuries, including loss of the rights and privileges of her elected office, loss of reputation, emotional distress, humiliation, and other damages in amounts to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – First Amendment**
**Retaliation**

136.    Plaintiff incorporates all other paragraphs of this Complaint as if set forth herein.

137.    At all times relevant to this Complaint, Defendants acted under color of state law.

138.    Plaintiff was engaged in protected speech and petitioning.

139.    Plaintiff's speech was on a matter of public concern. Plaintiff's association did not violate any law.

140.    Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech and/or petitioning rights.

141.    Defendants' conduct was a content-based and/or viewpoint-based restriction on Plaintiff's speech and petitioning.

142.    Defendants responded to Plaintiff's protected speech and petitioning activity with retaliation.

143.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of her free speech and petitioning rights.

144.    Defendants sought to punish Plaintiff for exercising her free speech and petitioning rights; to silence her future speech and petitioning; to stop her from continuing to speak and petition; and to restrict her freedom of expression and petitioning, along with the future speech and petitioning of others.

145. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in protected free speech and petitioning activity.

146. Defendants' conduct violated clearly established rights belonging to Plaintiff of which reasonable persons in Defendants' position knew or should have known.

147. Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

148. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer injuries, including loss of the rights and privileges of her elected office, loss of reputation, emotional distress, humiliation, and other damages in amounts to be proven at trial.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Equal Protection**

149. Plaintiff incorporates all other paragraphs of this Complaint as if set forth herein.

150. Defendants were acting under color of state law in their actions and inactions at all relevant times.

151. Plaintiff is a Black woman.

152. Defendants acted with the intent or purpose of depriving Plaintiff of the equal protection and benefits of the law, and equal privileges and immunities under the law, in violation of the Fourteenth Amendment.

153. Specifically, Defendants sanctioned Plaintiff and treated her worse because of her race, sex, and/or sex-plus-race. Such actions were not taken against similarly situated non-Black and/or male Regents.

154. Plaintiff's race, sex, and/or sex-plus-race were a motivating factor in Defendants'

26

decisions to discriminate and retaliate.

155.    Defendants had no rational basis for their discriminatory and retaliatory actions, let alone a purpose narrowly tailored to serve a compelling governmental interest in discriminating and retaliating against Plaintiff on the basis of her race, sex, and/or sex-plus-race.

156.    Defendants engaged in these actions or inactions intentionally, willfully, maliciously, and wantonly, showing deliberate indifference to and reckless disregard of Plaintiff's federally protected constitutional rights.

157.    Defendants' actions were objectively unreasonable considering the facts and circumstances confronting them.

158.    At the time of the complained of events, Plaintiff had the clearly established constitutional right to be free from discrimination based on race and sex and to enjoy the equal protection of the laws.

159.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer injuries, including loss of the rights and privileges of her elected office, loss of reputation, emotional distress, humiliation, and other damages in amounts to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – 42 U.S.C. § 1981**
**Racial Discrimination**

160.    Plaintiff incorporates all other paragraphs of this Complaint as if set forth herein.

161.    Defendants were acting under color of state law in their actions and inactions at all relevant times.

162.    Plaintiff is a Black woman.

163.    Defendants acted with the intent or purpose of depriving Plaintiff of the equal

27

protection and benefits of the law.

164. Specifically, Defendants sanctioned Plaintiff and treated her worse because of her race, sex, and/or sex-plus-race. Such actions were not taken against similarly situated non-Black and/or male Regents.

165. Plaintiff's race, sex, and/or sex-plus-race were a motivating factor in Defendants' decisions to discriminate and retaliate.

166. Defendants had no rational basis for their discriminatory and retaliatory actions, let alone a purpose narrowly tailored to serve a compelling governmental interest in discriminating and retaliating against Plaintiff on the basis of her race, sex, and/or sex-plus-race.

167. Defendants engaged in these actions or inactions intentionally, willfully, maliciously, and wantonly, showing deliberate indifference to and reckless disregard of Plaintiff's federally protected constitutional rights.

168. Defendants' actions were objectively unreasonable considering the facts and circumstances confronting them.

169. Plaintiff opposed activities prohibited by Section 1981 by, among other things, objecting to and reporting discrimination.

170. As a direct result of Plaintiff's protected opposition to activities prohibited by Section 1981, Defendants subjected her to actions that a reasonable elected official would have found materially adverse, including but not limited to censuring her, stripping her of all committee assignments, barring her from official representational events, and treating her worse because of her race, sex, and/or sex-plus-race where such actions were not taken against similarly situated non-Black and/or male regents.

171. Defendants' retaliation against Plaintiff arose out of, was caused by, and was like

and related to the race discrimination she opposed.

172.    Defendants treated Plaintiff more adversely than her similarly situated non-Black (and male) counterparts who did not voice their opposition to Defendants' discrimination.

173.    Defendants' asserted reasons for taking adverse actions against Plaintiff were pretext for illegal retaliation and did not actually motivate those actions.

174.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer injuries, including loss of the rights and privileges of her elected office, loss of reputation, emotional distress, humiliation, and other damages in amounts to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Wanda James respectfully requests that this Court enter judgment in her favor and against Defendants, and award her all relief allowed by law and equity, including but not limited to the following:

a.    All appropriate relief at law and equity;

b.    Declaratory relief, including a declaration that Defendants' investigation, censure, and sanctions of Regent James violated the First Amendment, the Fourteenth Amendment, and 42 U.S.C. § 1981;

c.    Injunctive relief, including:

1.    An order enjoining Defendants from enforcing the sanctions imposed on Regent James on July 2, 2025, and directing Defendants to rescind the censure and sanctions resolutions in their entirety;
2.    An order reinstating Regent James to all committee assignments she held or was eligible to hold prior to the July 2, 2025, sanctions;
3.    An order requiring Defendants to restore Regent James' full right to attend University events in her official representational capacity;
4.    Policy changes and mandatory training designed to prevent future retaliation against and racial discrimination against members of the Board of Regents;
5.    A public apology;

d.  Actual, economic damages as established at trial;

e.  Compensatory damages, including for past and future pecuniary and non-pecuniary losses, emotional distress, humiliation, loss of reputation, loss of enjoyment of life, and loss of dignity;

f.  Punitive damages against Defendants in amounts to be determined at trial;

g.  Pre-judgment and post-judgment interest at the highest lawful rate;

h.  Attorney's fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law; and

i.  Such further relief as justice requires.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Dated this 18th day of May 2026.

NEWMAN | MCNULTY, LLC

*s/ Andy McNulty*
Mari Newman
Andy McNulty
Madeline Leibin
1490 N. Lafayette Street Suite 304
Denver, CO 80218
(720) 850-5770
mari@newman-mcnulty.com
andy@newman-mcnulty.com
madeline@newman-mcnulty.com

ATTORNEYS FOR PLAINTIFF

30