IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 26-cv-02160-PAB-TPO

WANDA JAMES,

Plaintiff,

v.

CALLIE RENNISON, in her official and individual capacities,
KEN MONTERA, in his official and individual capacities,
ELLIOT HOOD, in his official and individual capacities,
FRANK MCNULTY, in his official and individual capacities,
RAY SCOTT, in his official and individual capacities,
ILIANA SPIEGEL, in her official and individual capacities, and
MARK VANDRIEL, in his official and individual capacities,

Defendants.

---

**ORDER**

---

This matter comes before the Court on the Renewed Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6) [Docket No. 55]. Plaintiff filed a response, Docket No. 58, and defendants filed a reply. Docket No. 63.

## I. BACKGROUND[1]

Regent Wanda James is an elected member of the University of Colorado Board of Regents (the "Board"), representing Colorado's 1st Congressional District. Docket No. 45 at 3, ¶ 9. Regent James is the second Black woman to be elected to the Board and is the only Black regent currently on the Board. *Id.* at 6, ¶ 23. Regent James is

[1] The facts below are taken from plaintiff's amended complaint (the "complaint"), Docket No. 45, and are presumed to be true, unless otherwise noted, for purposes of ruling on defendants' motion to dismiss.

also a prominent Black cannabis owner and was the first Black owner of a cannabis dispensary in the United States. *Id.*, ¶ 21. Regent James has used her position on the Board to advocate for communities of color. *Id.*, ¶ 25.

In late 2024 and early 2025, the Colorado School of Public Health ("CSPH") developed a public health campaign called *Tea on THC*. *Id.* at 9, ¶ 36. The *Tea on THC* campaign included use of the following image:




*Id.* at 9-10, ¶ 39. Regent James used her position as a regent and as a private citizen to criticize the *Tea on THC* campaign, asserting that it invoked racist stereotypes. *Id.* at 10-11, ¶¶ 40, 43. After Regent James criticized the *Tea on THC* campaign, the CSPH issued a public statement stating that it regretted any distress caused by the imagery used in the campaign and that it acknowledged its responsibility to reflect cultural

awareness and sensitivity. *Id.* at 11, ¶ 46. In addition to criticizing the *Tea on THC* campaign, Regent James spoke publicly about the lack of Black leadership within the University of Colorado. *Id.* at 12, ¶¶ 47-51.

Regent Policy 2.M is the Board's internal censure procedure. *Id.* at 13, ¶ 54. Regent Policy 2.M permits the Board to censure a regent who has breached a regent duty defined by a statute, Board law, or Board policy. *Id.* Approximately a month after Regent James spoke out against the *Tea on THC* campaign and the lack of Black leadership within the University of Colorado, the Board retained two law firms to evaluate allegations against Regent James. *Id.*, ¶¶ 55-56. The allegations involved Regent James's speech.[2] *Id.*, ¶ 57. On July 2, 2025, the Board met to consider censure and sanctions against Regent James. *Id.* at 18, ¶ 82. The Board claimed that Regent James was responsible for CSPH's budget being reduced by 50%, although the budget reduction occurred before Regent James spoke about the *Tea on THC*

[2] A resolution from the Board discusses the allegations underlying the investigation of Regent James and the sanctions the Board ultimately imposed after the investigation of those allegations was complete. *See generally* Docket No. 55-2. The resolution states that Regent James was alleged to have breached various regent duties by requesting that officials in the executive and legislative branches of the Colorado state government pull funding from CSPH and divert funding from the *Tea on THC* campaign to grants for marijuana business owners. Docket No. 55-2 at 2. The resolution also states that Regent James was alleged to have breached regent duties by expressing opinions critical of the *Tea on THC* campaign. *Id.* The resolution states that the Board finds, by a preponderance of the evidence, that Regent James breached regent policies regarding the duty of care and duty of loyalty. *Id.* at 3. Defendants assert that the Court may consider the resolution because it is referenced in the complaint and is central to Regent James's claims. Docket No. 55 at 2 n.3. Regent James does reference the resolution in her complaint. *See* Docket No. 45 at 22, ¶¶ 111-12. The Court agrees that the resolution indicating why Regent James was sanctioned is central to her claims that she was sanctioned for exercising her First Amendment rights. However, the Court need not consider the resolution to resolve the motion to dismiss.

campaign. *Id.* at 23, ¶¶ 113-14. Moreover, on January 31, 2025, the Governor's Office communicated to the legislature that it was seeking full elimination of CSPH's cannabis-related funding. *Id.*, ¶ 115. At the July 2, 2025 meeting, by a vote of seven-to-one, the Board voted to censure Regent James under Regent Policy 2.M, finding that she had violated Regent Policy 2.J.1 and Regent Policy 2.J.2, which respectively confer regents with a duty of care and duty of loyalty. *Id.* at 18, ¶¶ 83-84. In addition to censuring Regent James, the Board adopted a sanctions resolution. *Id.*, ¶ 86. The sanctions resolution removed Regent James from all regent committee assignments, precluded Regent James from any future regent committee assignments, and barred Regent James from attending internal or external University of Colorado events in her official capacity. *Id.*

On May 18, 2026, Regent James brought suit against the seven regents who voted to censure and sanction her. Docket No. 1. The operative complaint brings claims under 42 U.S.C. § 1983 for violations of Regent James's First and Fourteenth Amendment rights, as well as a claim for racial discrimination. Docket No. 45 at 29-36, ¶¶ 155-209. On May 18, 2026, the same day Regent James filed this action, Regent James filed a motion for preliminary injunction, requesting that the Court enjoin defendants from enforcing the censure and sanctions, restore Regent James to all committee assignments, and restore Regent James's right to attend University of Colorado events in her official capacity. Docket No. 2. Defendants filed a response on June 11, 2026. Docket No. 21. On June 12, 2026, the Court stated its intent to hold a preliminary injunction hearing, ordering the parties to file witness lists. Docket No. 22. That same day, defendants filed a motion to stay all proceedings except those

concerning immunity defenses. Docket No. 24. On June 15, 2026, defendants filed a motion to dismiss, asserting that they are entitled to legislative, quasi-judicial, and qualified immunity. Docket No. 25. On July 9, 2026, after having previously set a hearing on the preliminary injunction, Docket No. 37, the Court granted defendants' motion to stay all proceedings except those concerning immunity defenses. Docket No. 49.

On July 8, 2026, Regent James filed an amended complaint. Docket No. 45. Due to the filing of the amended complaint, the Court denied the motion to dismiss as moot. Docket No. 48. The Court ordered defendants to file a new motion to dismiss asserting immunity defenses which may be resolved as a matter of law. Docket No. 49 at 11. On July 21, 2026, defendants filed a motion to dismiss asserting that they are entitled to legislative, quasi-judicial, and qualified immunity and that Regent James has failed to state a claim. Docket No 55. On July 28, 2026, Regent James filed a response, Docket No. 58, and on August 10, 2026, defendants filed a reply. Docket No. 63.

## II. LEGAL STANDARD[3]

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[3] Defendants bring their motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* Docket No. 55 at 1. The Court will resolve the motion on the basis of absolute legislative immunity, which is properly analyzed under Rule 12(b)(6). *See Kamplain v. Curry Cnty. Bd. of Comm'rs*, 159 F.3d 1248, 1250 (10th Cir. 1998) (reviewing a 12(b)(6) motion to dismiss on the basis of absolute legislative immunity). Therefore, the Court will only state the legal standard for Rule 12(b)(6).

(2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

## III. ANALYSIS

Defendants' first argument is that they are entitled to absolute legislative immunity. Docket No. 55 at 3-6. "The principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo–American law." *Bogan v. Scott-Harris*, 523 U.S. 44, 48 (1998) "This privilege 'has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries' and was 'taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation.'" *Id.* at 48-49 (quoting *Tenney v. Brandhove,* 341 U.S. 367, 372 (1951)); *see also Gays Against Groomers v. Garcia*, 169 F.4th 981, 992 (10th Cir. 2026) (noting that legislative immunity has roots in the English Bill of Rights) (citation omitted). "Recognizing this venerable tradition," the Supreme Court has "held that state and regional legislators alike are entitled to absolute immunity from liability under § 1983 for their legislative activities." *Bogan*, 523 U.S. at 49 (citations omitted). Legislative immunity is "similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause." *Supreme Ct. of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 732 (1980) (citing *Tenney*, 341 U.S. 367). The government official invoking legislative immunity bears the burden of showing entitlement to such immunity. *Kamplain v. Curry Cnty. Bd. of Comm'rs*, 159 F.3d 1248, 1251 (10th Cir. 1998) (citation omitted).

"Absolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity." *Collins v. Daniels*, 916 F.3d 1302, 1317 (10th Cir. 2019) (quoting *Bogan*, 523 U.S. at 54) (internal quotations omitted). Thus, legislative immunity is "extended . . . to officials who are not themselves legislators so long as the suit seeks relief against the exercise of legislative power, underscoring that it is function,

not person, that confers immunity."[4] *Garcia*, 169 F.4th at 997 (citation omitted). Courts have found that board members of educational districts and facilities are entitled to legislative immunity, provided that they are acting in a legislative capacity. *See Douglass v. Garden City Cmty. Coll.*, 649 F. Supp. 3d 1152, 1173 (D. Kan. 2023) (finding that board members of a community college were entitled to legislative immunity when making budgetary decisions); *Niman v. Montana Univ. Sys.*, 718 F. Supp. 3d 1319 (D. Mont. 2024) (finding that the Montana Board of Regents was entitled to legislative immunity when voting to promulgate a policy); *Wilson v. Marshall Indep. Sch. Dist.*, 2011 WL 1431410, at *4 (E.D. Tex. Feb. 1, 2011), *report and recommendation adopted.*, 2011 WL 1431460 (E.D. Tex. Apr. 14, 2011) (finding that a school district was entitled to legislative immunity when disciplining one of its members).

Certain duties of the regents appear to be done in a legislative capacity. Traditionally, legislators have "[t]he authority to pass laws and the power of the purse." *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020). The Board of Regents "enact[s] laws for the government of the university," Colo. Rev. Stat. § 23-20-112(1), and has "control and direction of all funds of and appropriations to the university." Colo. Rev. Stat. § 23-20-111; *see also Churchill v. Univ. of Colo. at Boulder*, 285 P.3d 986, 1004 (Colo. 2012) ("the Regents are the highest authority in the University of Colorado system and enjoy complete independence to . . . dictate the University's policies and

[4] Citing *Stanley v. Magrath*, 719 F.2d 279, 284-85 (8th Cir. 1983), Regent James argues that regents, by virtue of their positions, are not entitled to legislative immunity. Docket No. 58 at 6. But Regent James's categorical argument is foreclosed by *Garcia's* holding that legislative immunity attaches to the exercise of legislative power rather than to individuals in certain legislative roles. 169 F.4th at 997.

programs.") (citations omitted). Furthermore, the regents must be elected.[5] Colo. Rev. Stat. § 23-20-102(1). Thus, the regents bear similarities to legislators in traditional legislative bodies, such as state legislatures.[6]

"Under the Supreme Court's functional test of absolute legislative immunity, whether immunity attaches turns not on the official's identity, or even on the official's motive or intent, but on the nature of the act in question." *Douglass*, 649 F. Supp. 3d at 1173 (citing *Bogan*, 523 U.S. at 54; *Forrester v. White*, 484 U.S. 219, 224 (1988)); *see also Kamplain*, 159 F.3d at 1251 ("In order to determine whether Defendants should be cloaked in legislative immunity, we look to the function that the Board members were performing when the actions at issue took place, . . . and we examine the nature of those actions.") (citations omitted). The Supreme Court "identified several nonexhaustive factors for identifying immunized legislative activity, like the 'discretionary, policymaking' nature of the act, the 'prospective implications' of the act, and whether the act occurred 'in a field where legislators traditionally have power to act.'" *Garcia*, 169 F.4th at 997 (quoting *Bogan*, 423 U.S. at 55-56).

"[C]ourts have repeatedly recognized that a legislature voting to censure or discipline one of its own members is a core legislative act," thus falling within the third factor of the functional test of legislative immunity. *Olmos v. City of S. El Monte*, 2026

[5] This is in contrast to the regents in *Stanley*, 719 F.2d at 284-85, who were elected by the state legislature rather than directly by constituents. *Dean v. Muscatine Cnty.*, 250 F. Supp. 2d 1094, 1103 n.7 (S.D. Iowa 2003).

[6] While it not a case involving legislative immunity, the Supreme Court in *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478-482 (2022), analyzed a First Amendment claim brought by an elected member of the Board of Trustees of the Houston Community College System by considering history and precedent involving state legislatures, indicating that there are similarities between boards of educational facilities and state legislatures.

WL 2367669, at *6 (C.D. Cal. July 7, 2026) (citing *Gamrat v. McBroom*, 822 F. App'x 331, 334 (6th Cir. 2020) (unpublished); *Whitener v. McWatters*, 112 F.3d 740 (4th Cir. 1997)). In *Whitener*, 112 F.3d at 743-45, the Fourth Circuit found that a legislative body disciplining its own members is a traditional legislative power, dating back to the English House of Commons. The court noted that this traditional legislative power was enumerated in the United States Constitution, giving Congress the power to "punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a Member." *Id.* at 744 (quoting U.S. Const. art. I,§ 5, cl. 2). Therefore, the court determined that "Americans at the founding and after understood the power to punish members as a legislative power inherent even in 'the humblest assembly of men,'" *id.* (quoting Joseph Story, *Commentaries on the Constitution of the United States* § 419), and that the power to punish "is the primary power by which legislative bodies preserve their institutional integrity without compromising the principle that citizens may choose their representatives." *Id.* (internal quotation and citations omitted). The Fourth Circuit held that members of a county board of supervisors acted in a legislative capacity when they disciplined one of the board's members and that the board was therefore entitled to absolute legislative immunity. *Id.* at 745. Other courts have found this reasoning persuasive. *See Wilson*, 2011 WL 1431410, at *5 (granting legislative immunity to a school district and its members for disciplining a member of the school district); *Jones v. Sexton*, 2025 WL 3000203, at *24-25 (M.D. Tenn. Oct. 24, 2025) (granting legislative immunity to representatives of the state house for disciplining another representative); *Olmos*, 2026 WL 2367669, at *6 (granting legislative immunity to a city council and its councilmembers for disciplining the mayor). Thus, the Court finds that a legislative

body, such as the Board, disciplining its own members is exercising a traditional legislative power, which weighs in favor of granting immunity.

As to the other factors, sanctioning Regent James was discretionary, but it did not deal with "policymaking." Thus, the first factor of the functional test weighs against finding that sanctioning Regent James was a legislative act. However, the second factor regarding the prospective implications of the sanctions weigh in favor of the sanctions being a legislative act. Defendants sanctioned Regent James for violating the duty of care and duty of loyalty. Docket No. 45 at 18, ¶¶ 83-84. The sanctions resolution indicates that this was due to, among other things, allegations that Regent James requested that officials in the executive and legislative branches pull funding from the Colorado School of Public Health and shift funding from the *Tea on THC* campaign to grants for marijuana business owners.[7] Docket No. 55-2 at 2. If the regents were unable to enforce the Board's internal policies, the adoption of such policies would be meaningless, and the regents would be hindered exercising their duties. *See Garcia*, 169 F.4th at 998 (noting that the adoption of rules "would be meaningless if legislators . . . could not enforce those rules."). For example, the regent's statutory power over the "control and direction of all funds of and appropriations to the university," Colo. Rev. Stat. § 23-20-111, would be diminished if regents could not enforce internal policies prohibiting a regent from acting contrary to the financial interests of the University of Colorado. Thus, the prospective implications of defendants

[7] Legislative immunity does not turn "on the official's motive or intent," so it is irrelevant to the immunity analysis whether defendants actually censured and sanctioned Regent James due to violations of the duties of loyalty and/or care or if that was a pretext to censure and sanction Regent James for discriminatory reasons. *Douglass*, 649 F. Supp. 3d at 1173 (citations omitted).

sanctioning Regent James relates to their legislative power, weighing in favor of the sanctions being a legislative act. Accordingly, because two of the three factors noted in the functional test weigh in favor of defendants, the Court finds that the seven regents who voted to sanction Regent James acted in a legislative capacity. Therefore, defendants are entitled to legislative immunity.

Regent James argues that *Kamplain*, 159 F.3d 1248, weighs against granting defendants legislative immunity. In *Kamplain*, 159 F.3d at 1250, the Tenth Circuit analyzed whether a board of county commissioners was entitled to legislative immunity for removing the plaintiff (who was not on the board) from a public hearing, and ultimately voting to ban him from all future commission meetings, after the plaintiff protested the board's award of a bid to a competitor of the plaintiff's employer. The court held that the board's vote to ban the plaintiff from all future commission meetings was not a legislative activity, finding that "the Board members were not voting on, speaking on, or investigating a legislative issue." *Id.* at 1252. Therefore, the court held that the board was not entitled to legislative immunity. *Id.* *Kamplain* is distinguishable. *Kamplain* involved the board of county commissioners disciplining a member of the public as opposed to disciplining one of its own members for violating an internal policy. Therefore, the Court finds that *Kamplain* does not bear on the legislative immunity analysis here.

Regent James filed a motion seeking discovery on the immunity defenses in the event the Court considers documents outside the pleadings. Docket No. 59. However, Regent James specifics that, "[i]f the Court confines its review to the Amended Complaint, no discovery is needed." *Id.* at 1. Because the Court did not consider

documents outside the pleadings, it will deny the motion for discovery. The Court will deny any other pending motions in this case as moot.

## IV. CONCLUSION

Therefore, it is

**ORDERED** that the Renewed Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6) [Docket No. 55] is **GRANTED**. It is further

**ORDERED** that the Motion for Preliminary Injunction [Docket No. 2] is **DENIED as moot**. It is further

**ORDERED** that the Motion for Discovery on the Immunity Defenses Raised in Defendants' Renewed Motion to Dismiss [Docket No. 59] is **DENIED**. It is further

**ORDERED** that the Motion to Expedite Ruling on Motion for Discovery and Renewed Motion to Dismiss [Docket No. 60] is **DENIED as moot**. It is further

**ORDERED** that plaintiff's claims are **DISMISSED with prejudice**. It is further

**ORDERED** that this case is closed.

DATED November 6, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge